JMr. Justice Huger
delivered the opinion of the court:
In this case, four questipns have been made for the consideration of the court:
1st. Was it incumbent on the insured to procure a licence or order in council for the landing of the cotton in England before the Crown Prince reached Portsmouth ?
2nd. Was the clearing for Antwerp, when her destinar fion was Portsmouth, sufficient to avoid the policy ?
3rd. Under the circuinstances stated, are the ensured entitled to claipa as for a total loss ? and,
4th, Is the finding of the jury conclusive on the seaworthiness of the ship ?
I shall consider the questions in the order they have .been stated;
1st. As to tlte licence. It is very clearly established that the revenue laws of Great-Britain prohibit the importation pf all produce, the growth of a foreign country, but in vessels of such country,-pr in British bottoms. It is equally clear that the cotton insured was the growth of the United States, and that the Crown Prince was 3 Swedish vessel. The defendants then undertook to insure a voyage which they must have known was prohibited by the laws of (3-reat-Britain. Whatever then be the risks of such a vayage, the defendants undertook to indemnify the plaintiffs in the event of a loss by either or all of them. — ¡ They cannot now be permitted to defend themselves on thp ground of the illegality of such a voyage. We are not here to enforce the revenue laws of another nation. — : Had this contract been iq derogation of our own, we must have declared it void. The penalty imposed by GreatJBritain for a breach of her laws may be enforced there, and tlje liability to such a penalty there, is a risk which srjay be legally inguped against hpre. I do not, however *509 Understand the defendants to go this length. They only Contend that the revenue laws of Great-Britain form a part .of the usage of the trade between that country and this, which are supposed to be known to the contracting parties, and with reference to,which, the policy is to be construed, and they insist that although the cotton in question was generally prohibited by the revenue laws of Great-Britain, yet, that it was the established usage to admit it to entry, whenever a licence to do so had been procured prior to the shipment; but of such a usage, they have furnished no evidence. It appears indeed that the lumber shipped with the cotton was protected by such a licence; but this lumber was clearly intended for the government of Great-Britain, and the licence was probably given as an inducement to the merchant to contract on better terms for the government. But independent of the peculiar circumstances attending this licence, its singularity is sufficient to repel the idea of the pretending usage. All the witnesses examined on this point prove (if they prove any thing) that the usage was to procure a licence or order in council aftér the arrival in Great-Britain. If ■therefore the policy was made with reference to any usage, it was to that of which these witnesses speak, and the understanding of the' parties was, that a licence was to be obtained on the ship reaching Portsmouth. As she never reached her destination, a licence or order in council for landing the cotton could not be procured. The insured, therefore, did not omit to do any thing that it was incumbent on them to do. On the first ground then, the appellants must fail.
On the second ground, it has been contended that the .clearance for Antwerp, when she was in fact to sail for, Portsmouth, was a material concealment, and enhanced the risk, and consequently discharged the underwriters. All the witnesses examined prove, that it was customary to clear out for a neutral, when destined for a belligerent, port. The object Avas to diminish, not increase the risk, .of capture. The French decrees had interdicted all trade *510 between neutrals and the British isles, and Britain had retaliated. Any means which were calculated to evade these outrageous and unjust restrictions were permissible, and a clearance from a neutral to a neutral port, was not only a justifiable, but in many instances an effectual shield against lawless violence. That this was the only object is. unquestionable ; that it diminished the risk of capture by French cruizers, I have no doubt ; that this was so understood by the defendants themselves, appears from the usage proved ; and that they knew of it,'appears not only from the usage proved, but from the publicity given to the course she was about to pursue. It was published in the daily papers of the city, days before the policy was effected, that she had cleared for Antwerp, and yet they insured her voyage to Portsmouth. But whether such a. clearance increased or diminished the risk, was'a question of fact for the jury ; they were so told ; they found for the plaintiff, and in so doing, have decided, that, in their opinion, the risk was not increased. In Planche and another vs. Fletcher, (Doug. 238,) Lord Mansfield lays down the same doctrine. On the second ground, therefore, the defendant must also fail. The third quesr tion has been embarrassed by considerations not necessary to its solution. Unquestionably, a voyage may be defeated by causes not covered by the policy, in which case the underwriters would not be responsible, and it is equally true that the plaintiffs could not at pleasure convert a partial into a total loss. They can only recover as for a total loss by shewing that the voyage ensured has been defeated by one or more of the perils enumerated and included in the policy ; that the voyage was defeated in this case, is unquestionable. The cotton was shipped here, and was to have been landed in Portsmouth, where it never got. The next enquiry is, by what causes or perils was the voyage defeated ? It is clear that the Crown Prince was obliged to put into New-York in consequence of springing aleak in a gale of wind or swell of the sea. The -repairs required were very serious, and must have occu *511 'pied much time. There were no less than five different surveys. When she arrived in New-York, does not exactly appear. It was I presume about the 23d of May, for on that day, the first survey-was had, and the surveyors were then of opinion “ that her upper- works were open and required calking, and that she should be lightened of her cargo in part or the whole, as the case may require, to find out the leak without heaving the vessel down.” On the 5th of June, the second survey (B.) was had ; the leak had not then been discovered, for the surveyors say among other things, that the sheathing of her stern was gone, and the main leak not being yet discovered, it was necessary, in their opinion, that she should fce hove keel out. On the 10th of June, the third survey (C.) was had, and it was discovered, say the surveyors, that her false keel was entirely shattered from stem to Stern ; her sheathing worm eaten, and her nails so much injured as to'render it necessary- that, she should be calked. On the second of July, the fourth survey (D) was had ; when further defects were discovered ; and on the 15tii of July, the fifth and last survey' was had, when stiil further defects were discovered. From these different surveys, it appears that the defects were not discovered at once ; that her repairs were commenced before the extent of them was ascertained, and that it was not until after the 15th of July, she could have re-shipped her cargo.— Long anterior to her arrival in New-York, the embargo act had been passed, which prevented all American vessels from sailing. The cotton, therefore, from the day of its being landed in New-York to the 18tb of June, when the declaration of war took place, could not have been transhipped in an American vessel, and from the provisions of the embargo act, the cotton could not have been shipped in any other neutral vessel pending that embargo, if one could have been found. Under tbe.se circumstances, the only' mode of forwarding the cotton appears to have been the one attempted by the captain, to repair' his 'ship and proceed on his voyage. For these repairs, hé *512 •applied to Mr. Boggs, and to repay him, .the cotton of tíié-'' plaintiff was sold. In selling this cotton, -however, the-captain appears to have done only what the necessitjr of the case imposed on him. For it appears from Bogg’s' testimony, that the vessel and cargo could not be hypothecated from the uncertainty of her fate, when she should ■arrive'in England, as well as from the political complexion of the times. '
Prioleau, for the motion.

Simons, contra.

The embargo then appears to have been a sufficient cause for not procuring a vessel for the transportation of the cotton after its arrival in New-York; and before the Crown Prince was repaired, the declaration of war prevented her carrying it. The voyage was then defeated, first, by the leak she sprung at sea ; second, by the embargo ; and lastly, by the war ; and all these perils arc? covered by the policy ; the first under “ the perils df the seas,” and the last two under “ all restraints and detainments of all kings or people of what nation, condition, oV quality soever.” On the third ground, therefore, the motion must also fail. I was of opinion on the trial of this ease below, that the Crown Prince was not seaworthy When she left the port of Charleston. I have since seen no cause to change my opinion. The court however regard it as a question for the jury, and they will not di-s* Éurb the verdict on that ground.
The motion is therefore discharged.
Justices Johnson, Nott and Gantt, concurred»'